IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| DIANA M. JORDAN, *as Wrongful Death Beneficiary of* THE ESTATE OF MARQUIS ANTHONY DREW, Deceased<br>Plaintiff | : : : : | UNITED STATES DISTRICT COURT<br>WESTERN DISTRICT OF PENNSYLVANIA |
| | : | |
| | : | CIVIL ACTION NO.: 2:23-cv-00772-CRE |
| v. | : | |
| | : | |
| RYAN MCWREATH | : | JURY TRIAL DEMANDED |
| and | : | |
| ANTHONY E. ANDRONAS | : | |
| and | : | |
| WASHINGTON COUNTY,  PA | : | |
| d/b/a WASHINGTON COUNTY, | : | |
| WASHINGTON COUNTY SHERIFF'S | : | |
| OFFICE, and WASHINGTON COUNTY | : | |
| DISTRICT ATTORNEY'S OFFICE | : | |
| and | : | |
| SAMUEL ROMANO | : | |
| and | : | |
| JASON M. WALSH | : | |
| and | : | |
| ESTATE OF EUGENE A. VITTONE, II | : | |
| Defendants | : | |

_____

**PLAINTIFF'S BRIEF IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

And now comes Plaintiff, Diana M. Jordan, as Wrongful Death Beneficiary of the Estate

of Marquis Anthony Drew, Deceased, by and through her counsel, and respectfully submits this

Brief in Opposition to Defendants' Motion for Partial Judgment on the Pleadings (ECF No. 81),

and in support thereof states as follows:

**I. STATEMENT OF THE CASE**

At approximately 7:45 p.m. on December 9, 2020, Marquis Anthony Drew was a

pedestrian walking upon the westbound shoulder of the roadway at or near 773 Old National Pike,

South Strabane Township, Pennsylvania, walking with the flow of traffic. At the same time and place, Defendant Ryan McWreath was operating a motor vehicle owned by Washington County and was acting within the course and scope of his employment with Defendants County, Sheriff's Office, and DA's Office.

The posted speed limit was 50 mph. Defendant McWreath was driving between 60 and 61 mph. Defendant McWreath was holding his cellular phone while on a telephone call with a confidential informant, did not have lights or sirens engaged, and had an unobstructed view ahead of him.

Defendant McWreath crossed the solid white fog line and entered the shoulder of the roadway, and, though he had a completely unobstructed view ahead of him, failed to observe Decedent walking upon the shoulder of the roadway. Because of Defendant McWreath's failure to observe Decedent, Defendant McWreath did not apply his brakes when approaching Decedent from behind, and did not make any evasive maneuvers to avoid striking Decedent. Defendant McWreath, driving at a speed of 60–61 mph, violently struck Decedent from behind.

It is believed, and therefore averred, that Decedent was then carried on Defendant McWreath's vehicle for more than one hundred (100) feet before falling off. Decedent then slid or rolled more than 50 feet upon the roadway, coming to rest only when his momentum was abruptly stopped by a ditch along the north berm of Old National Pike (State Route 40). When Defendant McWreath's vehicle drifted to its final resting place, it was straddling the fog line with the majority of the vehicle angled over the shoulder.

The debris field started at the center of the intersection and continued on for approximately 100 feet west of the Decedent. Damage to the SUV was concentrated at the right front passenger corner of the vehicle and the right corner of the windshield precisely where the vehicle would

make contact if the right front corner had crossed the fog line at impact, and entirely inconsistent with a central-lane collision in which a pedestrian was struck squarely in front of the vehicle. Defendant McWreath's vehicle was ultimately declared a total loss with more than $17,000.00 of accident-related damage.

Defendant McWreath observed Decedent laying on his right side in the ditch along the northern berm of Old National Pike (US 40). Defendant McWreath did not call out to Decedent, did not approach Decedent, did not check Decedent for a pulse, and did not render any type of aid to Decedent. Rather, Defendant McWreath telephoned his supervisor to advise of the accident. Defendant McWreath's supervisor did not telephone police after learning of the accident.

At 7:55:48 p.m. — nearly 11 minutes after the accident — Defendant McWreath telephoned the police to advise of the accident, using the non-emergency line instead of 911. Pennsylvania State Police were summoned to investigate the accident, arriving on scene at 8:01:01 p.m. Prior to Pennsylvania State Police arrival, Defendant McWreath was instructed by his supervisor to leave the accident scene. At some point during the sixteen (16) minutes between the accident and Pennsylvania State Police arrival on scene, Defendant McWreath did, in fact, leave the accident scene.

Washington County Coroner, Timothy Warco, and Deputy Coroners, BJ McKay and Rodney Bush, were eventually summoned to the scene. Upon their arrival, Deputy Coroners McKay and Bush observed Decedent still laying on his right side in the ditch along the northern berm of Old National Pike (US 40). Upon physical examination, Deputy Coroners McKay and Bush found Decedent warm to the touch and without rigor mortis and livor mortis. Deputy Coroners McKay and Bush eventually declared Decedent deceased at the scene.

Autopsy of Decedent's body determined the cause of death to be "blunt force trauma of the head and neck." Toxicology examination of Decedent's blood and urine "did not reveal any positive findings of toxicological significance."

Following the subject accident, Defendants failed to independently investigate the accident in which their employee, Defendant McWreath, killed Decedent. Defendants failed to get a statement or otherwise interview Defendant McWreath about the accident, failed to get a statement or otherwise interview any alleged witnesses, failed to have Defendant McWreath submit to toxicology testing, failed to perform any accident reconstruction, and failed to examine, download, or store the Event Data Recorder from the County vehicle.

The Second Amended Complaint (ECF No. 56) asserts state law claims against McWreath and Washington County sounding in negligence (Counts I and II), wrongful death and survival (Counts IV and V), and a federal claim pursuant to 42 U.S.C. § 1983 against all Defendants alleging deprivation of Decedent's substantive due process rights in violation of the Fourteenth Amendment (Count III).

Following motion practice, the remaining Defendants are McWreath, Andronas, and Washington County. Defendants now move pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings as to Plaintiff's Section 1983 claim, punitive damages claim against McWreath individually, and Plaintiff's wrongful death and survival counts (Counts IV and V).

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(c), judgment on the pleadings is appropriate where "the movant clearly establishes that no material issue of fact remains to be resolved and that [the movant] is entitled to judgment as a matter of law." Rosenau v. Unifund Corp., 539 F.3d 218,

221 (3d Cir. 2008) (quoting <u>Jablonski v. Pan Am. World Airways, Inc.</u>, 863 F.2d 289, 290–91 (3d Cir. 1988)).When considering a motion for judgment on the pleadings under Rule 12(c), "a district court applies the same standard to a judgment on the pleadings as a motion to dismiss pursuant to Rule 12(b)(6), but may also review the answer and instruments attached to the pleadings." <u>Snyder v. Daugherty</u>, 899 F.Supp.2d 391, 400 (W.D. Pa. 2012).

In doing so, "the Court must accept the factual allegations in the Amended Complaint as true and draw all reasonable inferences in the Plaintiff's favor." <u>Snyder</u>, 899 F.Supp.2d at 400 (citing <u>Allah v. Al-Hafeez</u>, 226 F.3d 247, 249 (3d Cir. 2000)). The three-step process mandated by the Third Circuit applies: first, identifying the elements of the claim; second, striking conclusory allegations not entitled to the assumption of truth; and third, evaluating whether the well-pleaded factual allegations "plausibly give rise to an entitlement for relief." <u>Snyder</u>, 899 F.Supp.2d at 400-01 (quoting <u>Malleus v. George</u>, 641 F.3d 560, 563 (3d Cir. 2011) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).

The Rule 12(c) standard does not permit a court to weigh competing accounts of the same events or to resolve disputed factual questions by choosing between conflicting versions of what occurred. Where material facts are genuinely in dispute as they are here on every central question judgment on the pleadings is improper, and the matter must proceed.

III.    ARGUMENT

A. <u>**The Pennsylvania State Police Report(PSP) Cannot Resolve Disputed Factual Questions and Does Not Disprove Plaintiff's Material Allegations.**</u>

Defendants' motion rests almost entirely on a single premise: that the PSP Report "disproves" Plaintiff's allegations and forecloses her Section 1983 claim as a matter of law. This premise fails for three independent reasons. First, the PSP Report's central conclusions are

disputed. Defendants assert that the PSP Report "indisputably confirms that the Decedent was actually walking in the roadway and, more specifically, in McWreath's travel lane, at the time of the Accident." But the PSP Report does no such thing.

The PSP Report characterizes Decedent's position as "unknown" and arrives at its conclusions based on inferences drawn from witness statements not from direct observation, scientific measurement, or accident reconstruction. Against this, Plaintiff's Second Amended Complaint alleges, and the physical evidence powerfully corroborates, that Decedent was walking on the shoulder to the right of the fog line when McWreath crossed that line and struck him. The Second Amended Complaint alleges that McWreath "crossed the solid white fog line and entered the shoulder of the roadway."

The physical evidence supports Plaintiff's version of events and, at a minimum, demonstrates the existence of material factual disputes that cannot be resolved on a motion for judgment on the pleadings.

After the collision, McWreath's nonfunctioning vehicle "drifted to a stop several hundred feet past the impact location" and came to rest "straddling the fog line with the majority of the vehicle angled over the shoulder." A nonfunctioning vehicle traveling straight in the travel lane and striking a pedestrian squarely in that lane would drift straight and come to rest in the travel lane not straddling the fog line with its majority on the shoulder. The vehicle's final resting position is direct physical evidence that it was already angled rightward across the fog line at impact.

Many of the things Decedent was carrying were strewn about the roadway's shoulder and the intersecting street, Anderson Drive, and the debris field from Defendant McWreath's vehicle extended several hundred feet, much of which was on the roadway's shoulder and the intersecting street, Anderson Drive. If the impact had occurred entirely within the travel lane, there is no logical

explanation for why Decedent's body, his belongings, and nearly all of the structural debris from McWreath's vehicle all came to rest predominantly to the right of the fog line. This physical evidence creates a genuine factual dispute that cannot be resolved at the pleading stage.

Moreover, damage to the SUV was concentrated at the right front passenger corner of the vehicle and the right corner of the windshield precisely where the vehicle would make contact if the right front corner had crossed the fog line at impact, and entirely inconsistent with a central-lane collision in which a pedestrian was struck squarely in front of the vehicle.

Second, the PSP Report cannot be treated as an impartial factual finding. This is not a routine accident report produced by disinterested investigators. McWreath was an on-duty Washington County Deputy Sheriff and Detective, and Defendant Andronas was his direct supervisor at the Washington County Sheriff's Office. The PSP investigators who produced the report are colleagues and professional allies of McWreath and the broader Washington County law enforcement apparatus.

Furthermore, the County's own post-accident conduct raises profound questions about the integrity of the investigation. Defendants failed to independently investigate the accident, failed to get a statement from or interview McWreath, failed to have McWreath submit to any toxicology testing, failed to perform any accident reconstruction, and failed to examine or download the Event Data Recorder from the County vehicle. This systematic institutional non-response is not neutral inaction. It is a deliberate choice to insulate McWreath from accountability.

The asymmetric toxicology evidence is the starkest illustration of this institutional bias. Toxicology examination of Decedent's blood and urine "did not reveal any positive findings of toxicological significance." Decedent was completely sober. Decedent the dead man was tested. His sobriety was documented.

McWreath's supervisor Gluth spoke with McWreath and discussed the matter of offering a voluntary blood sample, which McWreath agreed to do, and the blood specimen was entered into evidence at PSP-Washington. Yet no toxicology result vindicating McWreath was ever produced or preserved, and the blood sample was destroyed by the PSP months after collection.

Decedent's sobriety was established. The sobriety of the law enforcement officer who killed Decedent was not. This asymmetry is not coincidental. It is the product of a deliberate institutional decision to protect McWreath, and it is precisely the kind of decision that lies at the heart of Plaintiff's Section 1983 claim.

Third, This Court has now twice declined to dismiss these claims. Defendants cannot use Rule 12(c) to accomplish what they have twice failed to accomplish under Rule 12(b)(6).

When Defendants first moved to dismiss under Rule 12(b)(6), Magistrate Judge Eddy found in her February 14, 2024 Report and Recommendation that "at this stage of the litigation, it would be premature to strike Plaintiff's claim for punitive damages against Deputy Sheriff McWreath," and declined to dismiss the Section 1983 and punitive damages claims against McWreath, finding it premature to make those determinations without a fully developed factual record. When Defendants moved a second time on the same grounds, the August 4, 2025 Report and Recommendation found that all arguments raised by the County, Deputy Sheriff McWreath, and Deputy Chief Sheriff Andronas "were or could have been brought at the time they sought dismissal of Plaintiff's amended complaint," and that because some "were raised and rejected," Defendants "could have (and should have) made those arguments in their previous motion to dismiss" recommending denial of the motion as to those Defendants.

On the merits, the August 2025 R&R went further. It affirmatively recommended that the Fourteenth Amendment substantive due process claim under 42 U.S.C. § 1983 against Deputy Sheriff McWreath, Deputy Chief Sheriff Andronas, and the County remain as a live claim.

Defendants now bring the same arguments a third time through Rule 12(c). The PSP Report has not changed. Plaintiff's allegations have not changed. The applicable pleading standard has not changed. This Honorable Court should once again deny Defendants' Motion because it is premature as discovery has been stayed pending the outcome of Defendants' extensive motions practice.

**B.  <u>Plaintiff's Section 1983 Claim Against McWreath Is Properly Pled and Survives the Pleadings.</u>**

To state a Section 1983 substantive due process claim, a plaintiff must show that a governmental employee's "conduct amounts to an abuse of official power that shocks the conscience." <u>Porter v. Pennsylvania Dep't of Corr.</u>, 974 F.3d 431, 447 (3d Cir. 2020). "[O]nly the most egregious official conduct" can meet this standard. <u>United Artists Theater Circuit, Inc. v. Twp. of Warrington</u>, 316 F.3d 392, 400 (3d Cir. 2003). Whether a defendant's conduct "shocks the conscience" is a question of law for the court to decide. <u>Benn v. Universal Health Sys., Inc.</u>, 371 F.3d 165, 174 (3d Cir. 2004).

Defendants are correct that "[w]here a citizen suffers physical injury due to a police officer's negligent use of his vehicle, no section 1983 claim is stated." <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 854 n. 13, 118 S. Ct. 1708, 1715 (1998). But this case is not merely about McWreath's negligence. It is about a law enforcement officer's sustained, deliberate choices taken over time, with full awareness of the risk they created, in the performance of his official duties that killed a sober pedestrian who was walking exactly where a pedestrian is supposed to walk,

followed by systemic failure to properly investigate and document the accident in a blatantly effort to protect a fellow law enforcement officer. Evaluated in totality, that conduct presents a compelling case for conscience-shocking deliberate indifference.

### 1. McWreath's Pre-Impact Conduct Constitutes Deliberate Indifference to a Known Risk.

The relevant legal distinction is between negligent conduct which cannot support a Section 1983 claim and deliberate indifference to a known risk where the officer had time to deliberate which can. McWreath did not make a split-second error. He made a series of sustained, conscious choices.

McWreath was holding his cellular phone while on a telephone call with a confidential informant, conducting official law enforcement business, while driving at 60-61 mph in a 50 mph zone on an unlit rural road at night. This was not a momentary lapse. It was a sustained course of official conduct actively performing law enforcement operations by handheld phone, at speed, on a dark roadway that McWreath chose to maintain over the entire duration of the call.

An officer who holds his phone and conducts law enforcement operations at 61 mph on an unlit rural highway is making a deliberate, ongoing decision about how to perform his official duties, with full awareness that operating a motor vehicle at speed while distracted creates a known and serious risk of injury or death. That sustained deliberateness maintained over time, not thrust upon him in an emergency is what distinguishes this case from the police pursuit or emergency response scenarios that uniformly fail the conscience-shocking test.

Timko v. City of Hazleton, 665 F.Supp. 1130, 1134 (M.D. Pa. 1986) required a "factual basis for a finding that [the state official's] actions 'were inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the

conscience.'" A conscious, maintained decision to conduct official law enforcement telephone calls at 61 mph on a dark, unlit rural highway with no lights, no sirens, no emergency justification meets that standard. This is not excess of zeal in the pursuit of lawful objectives; it is reckless indifference to human life in the performance of routine duties.

Furthermore, McWreath related that as he focused on the oncoming headlights, the airbags deployed and the gauges began to go down. No reasonably prudent driver, and certainly no trained law enforcement officer, stares directly into oncoming headlights. Standard driver training teaches that when facing oncoming headlights, a driver should look down and to the right toward the fog line, using it as a reference to maintain lane discipline and protect against glare. This technique simultaneously prevents temporary blindness from oncoming lights and directs the driver's gaze to the very area where Decedent was walking.

Had McWreath followed this basic training at the moment of the oncoming truck's approach, his gaze would have been directed precisely at the fog line and directly at Decedent. McWreath's own account therefore establishes one of two things: either he was staring into the oncoming headlights rather than following basic driving protocol, or his attention was directed elsewhere entirely. Neither is consistent with reasonable driving. Both support the inference of deliberate indifference.

Defendant McWreath did not have lights or sirens engaged and had a completely unobstructed view illuminated by two (2) vehicles. He was not responding to an emergency. He was not engaged in a pursuit. The fact that failed to observe Decedent, did not apply his brakes when approaching Decedent from behind, and did not make any evasive maneuvers to avoid striking Decedent is completely inexplicable.

In an effort to explain the inexplicable, Defendants argue Decedent's being in the roadway was unforeseeable or unavoidable. Putting aside for a moment that there is no evidence Decedent was in the roadway (as opposed to the shoulder), Defendants' argue witnesses p[lace Decedent in the roadway earlier that night. This argument fails for three independent and compounding reasons.

First, and most fundamentally, not one of the five witnesses identified the pedestrian they observed as being Decedent. Rather, each described only an anonymous person in dark clothing. No witness provided a physical description sufficient to identify Decedent specifically, and none made any positive identification connecting the pedestrian they observed to the man later found dead in the ditch off East National Pike. Defendants' assertion that the pedestrian observed earlier in the evening was Drew is therefore pure speculation, and evidence premised on that unestablished assumption should be precluded entirely.

Second, even if that speculative identification were accepted, it would not help Defendants' position as every prior sighting placed the pedestrian walking westbound on the eastbound fog line or shoulder, which is the opposite side of the road from McWreath's westbound travel lane. McAtee specifically reported that the unidentified pedestrian "continued walking west on the east bound fog line." The prior sightings thus corroborate Plaintiff's theory, not Defendants', as these witnesses saw an unidentified pedestrian walking where pedestrians are supposed to walk, on the shoulder to his right, facing oncoming traffic.

Third, and independently fatal to Defendants' theory, even if the pedestrian was Decedent, and even if his behavior during those earlier encounters could be characterized as erratic or intentional, Defendants cannot establish his state of mind at the moment McWreath struck him from behind. Human intent is not static, and a person's mental state can change from moment to moment.  The passage of twenty to thirty minutes between the last reported sighting and the

collision is more than sufficient time for any prior state of mind to have shifted entirely. We will never know what Decedent was thinking in his final moments, other than fear, because he is dead, killed by the very Defendant who now seeks to weaponize speculation about Decedent's alleged earlier behavior to escape accountability for his own actions.

The law forecloses that result in Kmetz v. Lochiatto, 219 A.2d 488 (Pa. 1966), which holds that "where a plaintiff is rendered incompetent as a result of injuries he sustained, a presumption of due care follows: 'Where a plaintiff's mind is a blank as to an accident and all its incidents, the presumption is that he did all that the law required him to do and was not guilty of contributory negligence." Citing Auel v. White, 389 Pa. 208, 214 (Pa. 1957). Decedent is entitled to that presumption as Decedent did not see him before striking him, and neither did the other drivers (Mankey and Hettman) who were at the scene when Decedent was struck.  Having not seen him, none of them can say where Decedent was standing before or at time of impact, and any testimony in that regard would be pure speculation offered to improperly exonerate McWreath.

Finally, the "but for" analysis is dispositive: whether Decedent was on the shoulder or, as Defendants contend, in the travel lane, McWreath would not have struck him had he remained in his lane of travel. McWreath crossed the solid white fog line and entered the shoulder of the roadway. That crossing is the proximate cause of Decedent's death under any version of the facts, and the "he was invisible" defense[1] is therefore legally irrelevant to whether McWreath's conduct was negligent or worse.

---

[1] This defense is not available regardless of where Decedent was positioned.  "While the driver of a car is not required to notice every other car that happens to be approaching within the range of his vision, it is his duty to observe those which are within the area ordinarily covered in the act of looking. The law will not permit him to say that he looked where he had an unobstructed view without seeing what was in plain view."  Newman v. Reinish, 163 A. 58 (Pa. Super. 1932).  Moreover, "the law does not require a pedestrian to drape himself in a sheet in order to cross the street and proclaim to all motorists what he is doing. Pedestrians are allowed to dress as they desire even if the apparel may or may not be in fashion and motorists who run them down may not complain because in November the pedestrian was not wearing a white duck suit."  Kmetz, supra.

## 2. The Totality of Defendants' Conduct Shocks the Conscience.

Defendants correctly note that no court in this circuit has ever found sufficient evidence of conscience-shocking behavior in a police-vehicle accident case. But none of those cases involved what this case involves: a law enforcement officer who made deliberate, sustained choices before impact and then, after finding the victim laying in a ditch, he and his co-Defendants made a carefully choreographed series of steps to protect him and obscure his culpability. The conscience-shocking analysis does not require a court to evaluate each act in isolation. It requires an evaluation of the totality of the conduct. Evaluated in totality, what Defendants did shocks the conscience.

Plaintiff's Second Amended Complaint alleges, and this Court must accept as true, the following sequence: Defendant McWreath did not call out to, approach, check for a pulse, or render any type of aid to Decedent after finding him in the ditch. Instead, he telephoned his supervisor to advise of the accident, and Defendant McWreath's supervisor did not telephone police after learning of the accident. Thereafter, at 7:55:48 p.m. – nearly 11 minutes after the accident – Defendant McWreath telephoned the police, using the non-emergency line instead of 911.

Pennsylvania State Police arrived on scene at 8:01:01 p.m. Prior to their arrival, Defendant McWreath was instructed by his supervisor to leave the accident scene, and at some point during the sixteen (16) minutes between the accident and Pennsylvania State Police arrival on scene, Defendant McWreath did, in fact, leave. These are not the reflexive responses of a shocked driver who had just experienced an unexpected collision. They are a sequence of deliberate, coordinated decisions including removing the officer from the scene before investigators could arrive, question him, observe his condition, conduct field sobriety tests, or test his blood.

Post-impact conduct is not legally irrelevant to the Section 1983 analysis. It bears directly on McWreath's (and his co-Defendants') culpable state of mind, an element relevant to both the

conscience-shocking determination and punitive damages. A man who strikes a pedestrian, finds him in a ditch, calls his supervisor, dials the non-emergency line, and departs the scene at his supervisor's instruction before PSP arrives is telling the factfinder something about his attitude toward what he did. That conduct is illegal (75 Pa.C.S. §§ 3742, 3744, and 3746(a)(1)), and that attitude is not consistent with a driver who experienced an unforeseeable, unavoidable accident. It is consistent with a law enforcement officer who knew what he had done, knew why he had done it, and set about minimizing the consequences with the institutional assistance available to him.

Considered in totality the sustained pre-impact deliberate choices, the catastrophic force of impact, the failure to render any aid, the choreographed post-accident conduct, and the complete institutional suppression of evidence that followed this case presents facts that no other court in this circuit has confronted. Fagan v. City of Vineland, 22 F.3d 1296, 1307 (3d Cir. 1994), and the cases Defendants cite all involve emergency responses, police pursuits, or situations where officers had no time to deliberate. None involved an officer who maintained deliberate distraction over the duration of a phone call with a confidential informant, while speeding on a dark rural road, killed a sober pedestrian, and then systematically participated in the destruction and non-preservation of evidence necessary to establish what actually happened. That totality shocks the conscience, and accepting Plaintiff's allegations as true, this Court cannot rule otherwise as a matter of law.

### 3.  No Court Has Confronted These Facts.

Defendants assert that none of the courts in the Third Circuit have ever found conscience-shocking conduct in a police-vehicle accident case and suggest this forecloses Plaintiff's claim. The absence of prior precedent on these precise facts, however, establishes no ceiling on what conduct qualifies. The cases Defendants cite involve officers in pursuits or responding to emergency dispatches, situations defined by urgency, pressure, and minimal time to deliberate.

McWreath was doing none of those things. He was conducting a routine law enforcement telephone call with a confidential informant, driving at his own pace and his own chosen speed, on an unlit rural road, with an unobstructed view. These distinguishing facts, followed by deliberate post-accident conduct coordinated with institutional supervisors, are not matters considered in prior cases. They are different in kind. The absence of a prior case with comparable facts is not a reason to grant judgment on the pleadings; it is a reason to let this case proceed through discovery and trial on a full factual record.

### C. Plaintiff's Section 1983 Claim Against Andronas and the County Is Properly Pled and Survives the Pleadings.

Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037 (1978), holds that a municipality and its officials may be held liable under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Defendants argue that Plaintiff's Monell and supervisory allegations are "boilerplate" and "flatly disproved" by the PSP Report. Both arguments are patently false.

As to Andronas, the allegations are specific, not conclusory. The Second Amended Complaint specifically alleges that Andronas aided McWreath in depriving Decedent of his Fourteenth Amendment rights "by instructing [McWreath] to leave the scene before police arrival and failing to conduct any investigation whatsoever into Defendant McWreath's conduct." An instruction to remove an officer from a fatal accident scene before state investigators arrive is not a failure to supervise. It is affirmative personal participation in the deprivation. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988), and Stoneking v. Bradford Area School Dist., 882 F.2d 720, 725 (3d Cir. 1989), both require personal involvement by the supervisor in the

commission of the alleged conduct. The fact that McWreath left the scene at the instruction of his supervisor and that Andronas was McWreath's immediate supervisor creates a plausible inference, which Plaintiff is entitled to at this stage, that Andronas gave or approved that instruction[2]. Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010), requires only a "'plausible nexus' or 'affirmative link' between the [directions] and the specific deprivation of constitutional rights at issue." That plausible nexus is pled. The instruction to leave the scene directly caused the deprivation of any meaningful investigation, the non-preservation of contemporaneous toxicology evidence, and the inability of PSP investigators to question McWreath at the scene. That nexus cannot be resolved against Plaintiff on the pleadings.

As to the County, the allegations identify specific pre-accident policy failures not merely post-accident conduct. Defendants argue that post-accident failures "cannot constitute the moving force behind the accident." But Plaintiff's Monell theory does not rest solely on post-accident conduct. The Second Amended Complaint specifically alleges that the County "chose to hire Defendant McWreath and allow him to operate a County vehicle despite not having properly interviewed, vetted, or trained him." Had it done so, the OCUnty would have learned of McWreath's prior arrest and ultimate conviction / plea for a second tier DUI in 2010. This is a pre-accident failure of institutional screening.

Robinson v. Fair Acres Geriatric Ctr., 722 F. App'x 194, 199 (3d Cir. 2018), holds that liability for failure to screen attaches where "adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right[s]." The

---

[2] *A Few Good Men* immediately comes to mind. Colonel Jessup ordered the "Code Red" that killed Private William Santiago. The act was carried out by Colonel Jessup's subordinates, who faced murder charges as a result. It was not until trial that Colonel Jessup finally admitted his culpability.

County's decision to hire McWreath and place him in a county vehicle without proper vetting is precisely the kind of pre-accident institutional failure that Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397 (1997), and Robinson contemplate.

The Second Amended Complaint also alleges that the County "chose not to investigate deputy / detective related accidents and fatalities, emboldening [them] to act unreasonably, unjustifiably, and unconscionably knowing there would be no consequences for their actions." An institutional environment in which law enforcement officers know that accidents and fatalities will not be investigated, that no toxicology will be ordered, that no accident reconstruction will be performed, and that their supervisors will direct them away from the scene before investigators arrive is an institutional environment that communicates, through custom and practice, that misconduct carries no consequences. That institutional message, communicated before December 9, 2020, is the moving force behind McWreath's conduct on that night. Connick v. Thompson, 563 U.S. 51, 61 (2011), requires that a policy or custom be the moving force behind the constitutional violation  and an institutional culture of impunity is precisely such a custom.

Defendants' comparison to the Walsh dismissal is inapt. Defendants argue that allowing the Section 1983 claim to survive against Andronas and the County, after dismissing it as to Walsh, would create "inconsistent rulings." But the claims are not equivalent. Walsh was dismissed because the Second Amended Complaint failed to allege his personal involvement in any specific act. Andronas is alleged to have personally directed (or authorized) McWreath to leave the scene, a specific act with a specific consequence. The County is alleged to have maintained specific pre-accident policies that were the moving force behind McWreath's conduct. The factual allegations are meaningfully different, and different outcomes are not inconsistent. They reflect the application of the same legal standard to different facts.

Finally, the discovery stay makes dismissal of the <u>Monell</u> claim premature as a matter of law**.** Plaintiff has had no discovery in this case despite it having now been in litigation for 3.5 years. Discovery was stayed pending resolution of the repeated rounds of dispositive motions. Plaintiff has had no access to County policy documents, training records, prior incident reports, communications between Andronas and McWreath, or any other evidence bearing on the County's customs and practices.

A <u>Monell</u> claim, by its nature, requires documentary evidence of institutional policy evidence that exists, if anywhere, in County files that Plaintiff has been unable to access. <u>Connick</u> <u>v. Thompson</u>, 563 U.S. at 62, acknowledged that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference." Plaintiff cannot plead a pattern she has never been permitted to discover. Dismissing a <u>Monell</u> claim at the pleading stage, before any discovery, when the plaintiff has been kept from that discovery by Defendant's own litigation strategy, would be manifestly unjust and finds no support in applicable law.

The appropriate vehicle for testing the <u>Monell</u> theory on a full factual record is summary judgment after discovery, not judgment on the pleadings before any discovery has occurred.

### D.  Punitive Damages Against McWreath Individually Survive the Pleadings.

Plaintiff concedes that Pennsylvania does not permit punitive damages for wrongful death. <u>Harvey v. Hassinger</u>, 461 A.2d 814, 815-16 (Pa. Super. 1983). Plaintiff does not oppose dismissal of the punitive damages claim under Count IV only. Plaintiff vigorously contests dismissal of punitive damages under Counts II and V against McWreath in his individual capacity.

Defendants rely on three Pennsylvania cases for the proposition that cell phone use while driving is categorically insufficient to support punitive damages: <u>Xander v. Kiss</u>, 2012 WL 168326

(Pa. Com. Pl. Jan. 11, 2012); <u>Piester v. Hickey</u>, 2012 WL 935789 (E.D. Pa. Mar. 20, 2012); and

<u>Pietrulewicz v. Gil</u>, 39 Pa. D. & C.5th 332 (Pa. Com. Pl. Jun. 6, 2014). None of these cases involves

facts remotely comparable to those alleged here, and none are controlling.

In <u>Xander</u>, the defendant was a private citizen who talked on a phone and drifted out of his

lane.  He was not acting within an official capacity, was not speeding, and no post-incident conduct

bearing on his state of mind was at issue.

In <u>Piester</u>, the court found the defendant simply lost control of his vehicle. There was no

allegation of official law enforcement business, no sustained distraction, no excessive speed, and

no post-accident conduct relevant to the claim.

In <u>Pietrulewicz</u>, the defendant was a private citizen, on her phone, who failed to yield at an

intersection. Again, there was no allegation of official law enforcement business, no sustained

distraction, no excessive speed, and no post-accident conduct relevant to the claim.

None of these cases involved a trained law enforcement officer who chose to conduct

official law enforcement telephone call at 61 mph on a dark rural highway while in the course of

his duties, struck and killed a pedestrian, failed to render any aid, called his supervisor before

calling 911, used the non-emergency line, and departed the scene at his supervisor's instruction

before investigators arrived. The distinguishing principle is not whether a phone was involved, but

whether the actor made a sustained, deliberate choice, over time, with subjective appreciation of

the risk, in the performance of official duties. <u>Xander</u>, <u>Piester</u>, and <u>Pietrulewicz</u> address the former.

This case presents the latter.

Magistrate Judge Eddy found in her February 14, 2024 Report and Recommendation that

"at this stage of the litigation, it would be premature to strike Plaintiff's claim for punitive damages

against Deputy Sheriff McWreath." That finding was made under the identical pleading standard

now applicable. The factual allegations supporting punitive damages have not changed. Defendants offer no new arguments, only the same PSP Report this Honorable Court already considered and found insufficient to warrant dismissal.

Under Pennsylvania law, punitive damages require that "the defendant acted with a culpable state of mind, i.e., with evil motive or reckless indifference to the rights of others." Hutchinson v. Penske Truck Leasing Co., 876 A.2d 978, 983-84 (Pa. Super. 2005). "[A] showing of mere negligence, or even gross negligence, will not suffice." Phillips v. Cricket Lighters, 883 A.2d 439, 445 (Pa. 2005). Reckless indifference requires "some evidence that the person actually realized the risk and acted in conscious disregard or indifference to it." Burke v. Maassen, 904 F.2d 178, 182 (3d Cir. 1990). These are all factual considerations for the jury, not legal considerations for this Honorable Court.

In assessing punitive damages, a court examines not the end result but "the actor's conduct." Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984). "[T]he defendant's 'subjective appreciation of the risk of harm to which the plaintiff was exposed'" is a necessary element. Hutchison ex rel. Hutchison v. Luddy, 870 A.2d 766, 770-72 (Pa. 2005).

McWreath, as a trained law enforcement officer operating a county vehicle on official business, was driving between 60 and 61 mph in a 50-mph zone while holding his cellular phone on a call with a confidential informant, without lights or sirens engaged, on an unlit rural road at night. Every licensed driver, and every law enforcement officer with vehicle training, understands that inattentive driving at excessive speeds on a dark highway creates a known and substantial risk of injury or death. McWreath's deliberate choice to maintain that risk over a prolonged time establishes his reckless indifference in precisely the form Pennsylvania law recognizes as supporting punitive damages.

While <u>SHV Coal, Inc. v. Continental Grain Co.</u>, 587 A.2d 702 (Pa. 1991) holds it is not sufficient that a defendant failed to appreciate a risk, Defendant McWreath did appreciate the risk. Whether the totality of McWreath's conduct, inclduing the speed, the phone call, the failure to observe the fog line, the failure to observe Decedent, the post-accident coordination with supervisors, the departure from the scene, etc. constitutes reckless indifference sufficient for punitive damages is a question for a jury, not for this Honorable Court on the pleadings.

**E.  Counts IV and V Are Derivative Claims, Not Standalone Claims.**

Plaintiff does not dispute that wrongful death and survival claims are derivative, not standalone causes of action. <u>Sullivan v. Warminster Twp.</u>, 2010 WL 2164520, *6 (E.D. Pa. 2010), holds that "[w]rongful death and survival act claims are not substantive causes of action; rather, they provide a means of recovery for unlawful conduct that results in death." <u>Mohney v. Pennsylvania</u>, 809 F.Supp.2d 384, 389 n. 6 (W.D. Pa. 2011), confirms that these are "separate and distinct mechanisms by which a plaintiff may assert underlying claims."

Plaintiff's Counts IV and V have always been pled as derivative claims, not independent causes of action. Count IV expressly incorporates all preceding paragraphs by reference and is premised on the underlying negligence and Section 1983 claims that establish liability. Count V does the same. Defendants attack a straw man. The question is not whether Counts IV and V can stand alone because they cannot and were never intended to. The question is whether the underlying substantive claims survive this motion. Because they do, for all the reasons set forth above, Counts IV and V survive as the vehicles for recovering the damages to which Plaintiff is entitled.

**IV. CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion for Partial Judgment on the Pleadings in its entirety as to: (1) the Section 1983 claim (Count III) against McWreath, Andronas, and the County; (2) the punitive damages claim against McWreath under Counts II and V; and (3) Counts IV and V, which are and have always been pled as derivative claims that survive with the underlying substantive counts. Plaintiff concedes dismissal of punitive damages under Count IV (wrongful death) only, consistent with Harvey v. Hassinger.

The § 1983 claim, and the punitive damages claim that flows from it, are the mechanism by which Marquis Drew's family can obtain full accountability from the individual officer who killed him and the institution that protected him. This Court should allow this case to proceed to discovery and trial so that a jury can evaluate – on a complete factual record, not on a police report written by McWreath's colleagues – whether what happened on Old National Pike on the night of December 9, 2020 was a tragic accident or something far more serious.

**WHEREFORE**, Plaintiff, Diana M. Jordan, as Wrongful Death Beneficiary of the Estate of Marquis Anthony Drew, Deceased, respectfully requests that this Honorable Court:

1. DENY Defendants' Motion for Partial Judgment on the Pleadings in its entirety as to Plaintiff's Section 1983 claim (Count III) against Defendants McWreath, Andronas, and Washington County;

2. DENY Defendants' Motion for Partial Judgment on the Pleadings as to Plaintiff's claim for punitive damages against Defendant McWreath under Counts II and V;

3. DENY Defendants' Motion for Partial Judgment on the Pleadings as to Counts IV and V, which are derivative claims that survive with the underlying substantive counts;

4. GRANT such other and further relief as this Court deems just and proper.

Respectfully submitted,

**GIBBONS LEGAL, P.C.**

By: _____

Thomas J. Gibbons, Esquire
Counsel for Plaintiff